UNITED STATE DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| CSI CAPITAL MANAGEMENT, INC. et al )<br>Plaintiffs )<br> )<br>v. )<br> )<br> )<br>PRIM CAPITAL CORPORATION et al )<br> )<br>Defendants ) | Case No. C O3-1397 CRB<br><br>Judge: Charles R. Breyer<br><br>**ANSWER AND<br>COUNTERCLAIM** |

Defendants Prim Capital Corporation ("PCC") and Prim Advisors, Inc. ("PAI")

(collectively "Defendants"), for their defenses, answer and counterclaim, to the Complaint of

Plaintiffs CSI Capital Management, Inc. ("CSI") and Leland Faust ("Faust") (collectively

"Plaintiffs") aver and state as follows.

## FIRST DEFENSE

1. The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

2. Plaintiffs' claims are barred by the doctrines of unclean hands and estoppel.

## THIRD DEFENSE

3. Plaintiffs have knowingly and intentionally made false and untrue statements of

fact in their Complaint, in violation of Rule 11 of the Federal Rules of Civil Procedure, thereby

warranting the imposition of sanctions thereunder.

## FOURTH DEFENSE

4. Plaintiffs have knowingly and intentionally brought frivolous litigation and have not come before this court seeking relief in good faith, as evidenced by the fact that the Complaint contains numerous false and untrue statements and the fact that Plaintiffs have made no attempt to serve Defendants with the Complaint and did not even provide an address for Defendants to the Clerk of Courts when the action was filed.. Plaintiffs have brought his action for ulterior motives, intending to injure the business of Defendants by the act of initiating this action and by using the existence of this action and the false allegations contained therein to attempt to induce persons not to do business with Defendants.

## ANSWER

Defendants answer Plaintiffs allegations *seriatim* as follows:

### PLAINTIFFS

1. Defendants are without knowledge or information sufficient to form a belief as the truth of the allegations contained in paragraph 1 of the Complaint, except that they deny that Faust is "highly respected" and say that in fact he has been engaging in deceptive, unethical and illegal conduct vis a vis clients for whom he and CSI serve as agents, attorneys and advisors.

2. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint, except that Defendants say that their investigation of the activities of Faust and CSI shows that the same are engaging in deceptive, illegal, and unethical practices unbeknownst to their clients.

## DEFENDANTS

3. Defendants admit the allegations contained in paragraph 3 of the Complaint, except that they deny that they provide accounting services and further state that Prim Real Estate has not conducted any business.

## JURISDICTION AND VENUE

4. Defendants admit that this court has subject matter jurisdiction, and consents to venue in this District, even though Plaintiffs have made no attempt to serve Defendants and apparently had no intention of actually prosecuting this action.

## FACTS

5. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 5, except that they assert that whatever service Faust determined to bring to the financial world, it is not "honest, serious, and competent."

6. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 6.

7. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 7

8. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 8

9. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 9, except that they admit that all of CSI's clients that defendants have analyzed, have invested in the CSI Equity Fund and that the same has fee provisions built into its structure.

10. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10, although they admit that they are aware of and are familiar with the performance and rating of the CSI Equity Fund.

11. Defendants are without knowledge or information sufficient to form a belief as the truth of the averments contained in paragraph 11.

12. Defendants deny the allegations contained in paragraph 12.

13. Defendants deny the allegations contained in paragraph 13.

14. Defendants deny the allegations contained in paragraph 14.

15. Defendants deny the allegations contained in paragraph 15, and note that at all times the activities they conducted with NBA players and teams were approved and authorized by the National Basketball Players Association ("NBPA").

16. Defendants deny the allegations contained in paragraph 16, in that they do not fairly or accurately describe the services that Defendants offer to NBA players.

17. Defendants admit that they have reviewed the investments and performance of certain of CSI's clients and deny the remaining allegations of paragraph 17.

18. Defendants deny the allegations contained in paragraph 18.

19. Defendants deny the allegations contained in paragraph 19.

20. Defendants deny the allegations contained in paragraph 20.

## FIRST CAUSE OF ACTION

21. Defendants incorporate as if fully restated herein their prior responses in response to the allegations of paragraph 21.

22. Defendants deny the allegations contained in paragraph 22.

23. Defendants deny the allegations contained in paragraph 23.

24. Defendants deny the allegations contained in paragraph 24.

25. Defendants deny the allegations contained in paragraph 25.

26. Defendants deny the allegations contained in paragraph 26.

## SECOND CAUSE OF ACTION

27. Defendants incorporate as if fully restated herein their prior responses in response to paragraph 27.

28. Defendants deny the allegations contained in paragraph 28.

29. Defendants deny the allegations contained in paragraph 29.

30. Defendants deny the allegations contained in paragraph 30.

31. Defendants deny the allegations contained in paragraph 31.

32. Defendants deny the allegations contained in paragraph 32.

33. Defendants deny the allegations contained in paragraph 33.

## THIRD CAUSE OF ACTION

34. Defendants incorporate as if fully restated herein their prior responses in response to paragraph 34.

35. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 35.

36. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 36.

37. Defendants deny the allegations contained in paragraph 37.

38. Defendants deny the allegations contained in paragraph 38.

39. Defendants deny the allegations contained in paragraph 39.

40. Defendants deny the allegations contained in paragraph 40.

41. Defendants deny the allegations contained in paragraph 41.

## FOURTH CAUSE OF ACTION

42. Defendants incorporate as if fully restated herein their prior responses in response to paragraph 42.

43. Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 43.

44. Defendants deny the allegations contained in paragraph 44.

45. Defendants deny the allegations contained in paragraph 45.

WHEREFORE, having fully answered the Complaint, Defendants pray for a judgment of dismissal thereof, and for their costs, attorneys' fees and such other relief as may be just.

## COUNTERCLAIM

1. Defendants, for their Counterclaim against Plaintiffs, incorporate their defenses and answers to the Complaint, and further state as follows.

2. With the authorization and approval of the NBPA, Defendants have since 2001 been offering investment portfolio analysis and monitoring services to NBA players (the "Services") in accordance with two agreements that they execute with players, forms of which are attached hereto as Exhibits A and B respectively (the "Agreements"). The Agreements accurately reflect the services offered at the time, and include an express authorization for Defendants to obtain information from advisors and other vendors currently providing services to the client. Certain principals of Defendants-Joseph Lombardo and Anthony Delfre have been providing various investment services through other employers for 10 years on behalf of the NBPA, and this upcoming season will be Mr. Delfre's 7th season providing the Financial Awareness Program to the NBA players.

6

3. In general, Defendants' goal and obligation under these Agreements is to analyze and evaluate clients' investments and fees paid for investment advice, compare them to fees charged by others, identify the opportunity for fee reductions where possible, and make various recommendations regarding fees and investments, working in conjunction with the clients' existing advisors. The purpose of the Agreements is as stated therein, and they are not designed or intended to interfere with an existing contract or agreement between a client and an advisor, nor are they intended as a vehicle to seek to cause a client to terminate an agreement with an existing advisor.

4. The genesis of the authorization by the NBPA of Defendants to approach players with the Agreements was a concern by the NBPA that certain players may be unaware of fees they were paying for investment and other services, or unaware of typical fees charged by others, and that fees being paid by players might not be competitive or optimal for the player in light of the highly competitive nature of the market for financial service and the corresponding lowering of fees which characterizes the market for such services over the last several years.

5. On or about April 23rd 2003, Prim Advisors entered into an agreement with NBPA relating to the Services, a true copy of which is attached as Exhibit C.

6. In connection with offering the Services to NBA players, Defendants entered into agreements to provide comparative analysis services for four clients of CSI; Bryant Stith ("Stith"), Elton Brand "(Brand"), Howard Eisley ("Eisley"), and Pat Garrity ("Garrity").

7. When Defendants, pursuant to their contract with Stith, requested information from CSI relating to fees charged and other information relating to Stith, CSI refused, and ignored repeated requests for such information.

8. On July 11, 2002, Stith contacted NBPA and lodged a formal complaint against CSI for such refusal. G. William Hunter, on behalf of NBPA, notified CSI on August 23, 2002 that it had an obligation to provide the information that Stith requested be provided to Defendants. (Exhibit D)

9. On or about the same date, Steven Kravitz, general counsel for CSI, left a voicemail message for Anthony Delfre, a principal of Defendants, stating as follows" "Anthony. Steven Kravitz, General Counsel for CSI Capital. Discussed your situation with Stith and Brand. They both were misinformed by you as to the nature of your relationship with the NBPA. Therefore, they told us to disregard further inquires form you. That's pretty much what I expected. Good luck to you."

10. Defendants thereafter had a meeting with Stith and replayed the message left by Steve Kravitz of CSI. Stith denied rescinding his "written" authorization and affirmed that he desired to use Defendants' services, that he wanted CSI to provide the information he had previously authorized CSI to provide, and the Kravitz's statements as to him (Stith) were false.

11. On August 26, 2002, Prim Capital responded to the message left by Kravitz that they would not tolerate these practices and notified them of their intentions if this practice continued. (Exhibit E)

12. On August 27, 2002, at the urging of CSI and its agents Kravitz and Faust, Brand rescinded the agreement he had entered into with Defendants.

13. On December 2, 2003, in San Francisco, CA, G. William Hunter, Executive Director of NBPA, Anthony Delfre, and Faust held a meeting. Mr. Hunter asked Faust to provide a breakdown of the time spent by CSI to justify certain fees charged by CSI to Brand as compared to fees charged to Stith and Garrity. Faust stated that CSI, Faust, and other CSI agents did not keep time records with respect to fees charged under its agreement with Brand. Faust then stated CSI provided varying degrees of service to the players even though the contracts with those players were identical and had no time records to substantiate that claim. Faust stated he would construct records of the work conducted on Brands' behalf and provide them to Mr. Hunter. Mr. Hunter, an attorney, stated that he could not understand how a firm that provides legal services does not keep time records to determine the productivity of it's lawyers and that this was highly uncommon based on his knowledge of the legal business. Mr. Hunter also stated that Faust puts himself in a difficult position if the player (Brand) does not recall the work that they claim to have provided and they cannot provide the time records to validate that those services were in fact provided.

14. In reviewing the information that CSI did provide relating to Stith, Eisley, Brand and Garrity, Defendants discovered that CSI was charging a "Financial and Legal Services Fee" but that each was charged a different amount for Financial and Legal Services, and that such fees were inconsistent and excessive in various cases. Stith was charged $30,000, Brand $50,000, Eisley $20,000, and Garrity $10,000 for virtually identical services. At one time, Stith's fees for financial and legal services were based on a formula equal to one and one half percent of his salary, without regard to the time and nature of the services performed. Through 2000, Stith was charged an amount in excess

of $300,000 for Financial and Legal Services fees without time records or other back-up showing the extent and nature of services performed.

15. In a conference call between Defendants, CSI and Faust, Defendants ask Faust how the Financial and Legal Services Fees were derived. Faust stated that they were "negotiated" with each player and were not standard, even though the nature of the service to each player was virtually identical.

16. Defendants also asked Faust to substantiate the Financial and Legal Services Fee charged to players under contract with Defendants. In response, Faust reiterated on at least two occasions that he did not keep time records, even for the legal fees portion of the Financial and Legal Services Fee. Faust could not therefore substantiate the time spent on services performed for the Financial and Legal Services Fees charged to clients.

17. At a meeting on March 10, 2003, in New York, with Faust, G. William Hunter, Theresa Clark Messer (Director of Finance NBPA) and Anthony Delfre, Faust stated that he had on his own volition discontinued the practice charging fees for tax and legal services on the basis of a percentage of income, when in fact he did so only after receiving a complaint from a client for charging excessive fees vis a vis the same service for others. Mr. Hunter asked Faust how he had arrived at the list of services that they claim to have provided for Brand. He wanted to know if the items listed were recorded as the work was being performed or if this list was created as a result of his inquiry. Faust stated that with all of the items were reconstructed based upon their memory of services they claim to have performed. Theresa further inquired, as a former auditor with a Big Four firm, how could an independent auditor like PWC or E&Y ever arrive at the validity and methodology of their charges without any basis(i.e. hourly or project based)

due to the lack of contemporaneous records. Faust had no response to the inquiry other than they negotiate the fees with each player based upon their estimated time and scope of the work. The final issue that was addressed related to the conflict of interest waiver that CSI has the player sign as it relates to money being invested in their own proprietary mutual Funds. Faust replied that they meet in person or via teleconference and thoroughly explain to each player the conflict that exists that they are waiving.

18. In reviewing investment advisory fees charged by CSI to player under contract with Defendants, Defendants discovered that CSI's fees were 1 % for assets under management less than $5 million; .75% for assets between $5 and $10 million; and .5% for assets over $10 million.

19. Defendants further discovered that each player's assets were primarily invested in CSI Equity Fund or CSI Fixed Income Mutual Funds (collectively "CSI Mutual Funds"), for both of which CSI was the investment advisor, such that CSI was acting as investment advisor for both the mutual funds and the players in which CSI caused players to invest.

20. Defendants further discovered that CSI had represented to Stith, Brand, Eisley and Garrity that the investment advisory fee based on assets under management would not apply if they invested in CSI Mutual Funds. In fact, CSI credited back to clients a portion of the mutual fund management fee but charged the full investment advisory fee contrary to CSI's promises to its clients.

21. Defendants also discovered that CSI acknowledges to clients that it has a conflict of interest regarding its decision to place clients in CSI Mutual Funds when it

acts as advisor to both the client and the CSI Mutual Funds, but that CSI requires the client to acknowledge as follows:

> CSI has a conflict of interest with the Client regarding CSI's decision to invest Client's accounts in CSI Mutual Funds, and by signing this Agreement, Client represents that Client has made Client's own independent decision that investment of all or a portion of Client's accounts in CSI mutual funds is appropriate.

CSI knows, however, that clients are not aware of all the effects and ramifications of this conflict, are not in fact making their own determination as to the propriety of investing their assets in CSI Mutual Funds, and in reality clients are relying on CSI and its expertise to make the very determinations that CSI purports to pass off as being made by the client.

22. Defendants further discovered that CSI never discussed this waiver language with them, never explained the conflict, never informed them that CSI was attempting to shift the responsibility for decisions CSI was making to the client, and that the clients, when shown this provision were unaware if its existence in any contract and did not understand it. In Defendant Delfre's meeting at the home of Howard and Tai Eisley on March 11, 2003 when a copy of the waiver was provided for their review Tai stated " I have never seen or was explained anything about the waiver by CSI" and Howard stated that " I don't remember signing it, but a lot of things come in the mail from CSI for me to sign and return. They (CSI) never met me or called to explain the waiver, 'I feel as if I've been taken advantage of.' This is in direct contrast of the claim that was made by Faust the day before in front of Mr. Hunter, Ms. Messer, and Mr. Delfre that CSI thoroughly explains this waiver in person or via teleconference.

23. CSI did not provide Stith, Brand, Eisley or Garrity with any investment analysis comparing the performance of other investments or mutual funds with that of CSI Mutual Funds.

24. The performance of CSI Fixed Income Fund for 2003, as rated by Morningstar, has been extremely poor when compared to the relative performance of other fixed income funds, ranking in the bottom 6% of fixed income funds as of March 31, 2003. For the past year, this fund has been ranked in the bottom 30%, meaning 70°/ of all fixed income funds-not affiliated with CSI-are outperforming CSI's fixed income funds. CSI does not disclose this to its clients and does not make investment decisions with respect to its fixed income funds that are in the best interests of its clients. In fact, given this low return and the fact that CSI purports to provide clients with tax advice, a tax free-mutual fund would have been a more appropriate investment than CSI's own fixed income fund.

25. CSI did not diversify investments for clients whose portfolio's Defendants reviewed.

26. In addition to the foregoing, in March 2003 Defendants requested information from CSI regarding another mutual client, Danny Fortson. Fortson asked Defendants to coordinate the information request with Fortson's agent, Raymond Brothers.

27. In the course of conversations with Mr. Brothers, Mr. Brothers disclosed to Defendants that CSI had paid $100,000 to a person who Mr. Fortson had believed was a friend during high school and college, the real purpose of which, not disclosed to Mr. Fortson, was to steer Mr. Fortson to CSI and have him become a CSI client. Paying

solicitation fees to persons who direct clients to investment advisors without disclosing the same is a violation of the Investment Advisers Act of 1940, as amended.

28. CSI also invested significant funds of Mr. Fortson into "deals" (limited partnerships and/or private placements) sponsored by CSI without disclosing the inherent conflicts in so doing.

29. CSI also offered to refer players to Mr. Brothers, in which he would then represent them and have a financial gain, in return for discouraging his client from dealing with Defendants. Mr. Brothers also stated that CSI had hand delivered or via overnite delivery rescission letters for Mr. Fortson to sign at every hotel that Mr. Fortson was staying from the time he retained Prim until the eventual rescission of Prim's services. Mr. Brothers further stated that other clients of his were sold disability insurance policies by CSI even though their NBA contracts are guaranteed and claims to have demanded this reversal. The final accusation that Mr. Brothers made revolved around the fact that Mr. Fortson never met his agent, Arn Tellem, until the day of the NBA draft and was delivered to Mr. Tellem by CSI and/or a solicitor for CSI in which a payment referenced earlier was a result of this referral.

30. These and other discoveries by Defendants relating to CSI's business are perceived by CSI as a threat to its business because by so doing Defendants have discovered and will continue to discover various improper, illegal, and or unethical practices by CSI, and many other practices that are simply not in the best interest of the clients.

31. CSI is making false statement about Defendants, their relationship with the NBPA, its contracts, its motives, and its fee structure, with the specific intent to injure the

business of Defendants, discredit Defendants, and attempt to cause clients to believe that it is Defendants, and not CSI and Faust, who are acting improperly, including specifically the allegations contained in paragraphs 18a-c, g-h and 19a-f of the Complaint, which allegations are false..

32. CSI and Faust are also distorting and or mischaracterizing certain circumstances and events concerning Defendants and its principals in an effort to discredit them, including specifically the allegations contained in paragraphs 18d, e, and f of the Complaint.

33. On information and belief, Defendants say that CSI and Faust are circulating their Complaint amongst NBA players to injure the business and reputation of Defendants, while knowing that statements contained therein are false or misleading, not intending to prove them (not having ever served Defendants with the Complaint), but believing that the fact that the statements are contained in a lawsuit will have a more negative impact on Defendants than if made elsewhere.

## FIRST CAUSE OF ACTION
### (Malicious Prosecution)

34. For their First Cause of Action Defendants incorporate all prior allegations, and aver as follows:

35. Plaintiffs filed this action with the intent to injure the business and reputation of Defendants, to discredit them in the eyes of current and potential clients, and to use the filing of the case as a vehicle to give their false allegations about Defendants more credibility.

36. Plaintiffs, on information and belief, are showing their Complaint to clients and potential clients and asserting that statements made about Defendants in the case are true and have publicly disclosed the filing of the case and its contents.

37. Plaintiffs have never officially served the Complaint on Defendants, did not provide any instructions or address for service to the Clerk of Courts when filing the Complaint nor at any other time, and therefore had no intent of prosecuting this action but instead filed the case for improper and malicious purposes.

38. Plaintiffs have therefore engaged in malicious prosecution of this case in violation of the laws of the State of California.

## SECOND CAUSE OF ACTION
### (Defamation)

39. For their Second Cause of Action, Defendants incorporate all prior allegations, and further say that Plaintiffs have engaged in a deliberate and malicious course of dealing to defame Defendants by making both oral and written false statements about them, intending to cause injury to Defendants, including those statements as set forth in paragraphs 18 and 19 of this Complaint.

40. In addition, without legal privilege, CSI and Faust caused their counsel to send to G. William Hunter a letter concerning defendants, a copy of which is attached hereto as Exhibit F, which contains statements that are false and defamatory and was designed to cause injury to Defendants and interfere with their relationship with Mr. Hunter and the NBPA. Defendants response to March 31, 2003 is attached. Exhibit G

41. Said false and defamatory statements are the direct and proximate cause of injury to the business and reputation of Defendants.

## THIRD CAUSE OF ACTION

### (Tortuous interference with contract)

42. For their Third Cause of Action, Defendants incorporate all prior allegations and further say that Plaintiffs are aware that Defendants have contacts with certain clients of CSI.

43. Plaintiffs have knowingly and intentionally made false statements to said clients about Defendants, as set forth herein, and have further refused to provide information to Defendants and have discouraged clients from dealing with Defendants, with the intention of interfering with and causing termination of contracts between said client and Defendants.

44. At least one client of Defendants terminated his contract with Defendants based on such false statements and interference with Defendants' contractual obligations and duties.

45. Plaintiffs continue to make false statements to clients of Defendants with the intention to cause said clients to terminate their contracts.

46. Defendants have suffered, and will continue to suffer damages as a proximate result of Plaintiffs' unlawful and tortuous interference with Defendants' contracts.

## FOURTH CAUSE OF ACTION
### (Unfair and Deceptive Trade Practices)

47. For their Fourth Cause of Action, Defendants incorporate all prior allegations and further state as follows:

48. The foregoing conduct by Plaintiffs constitutes the disparagement of the services and business of Defendants by false and misleading representations of fact, in violation of the Ohio Deceptive Trade Practices Act, Chapter 1345 Ohio Revised Code, Section 1770 of the California Civil Code, and similar statutes in other jurisdictions.

49. Said practices are ongoing and continuing, thereby warranting the grant of injunctive relief under said statutes.

50. Defendants have suffered, and continue to suffer damage to their business as a proximate result of said violations by Plaintiffs.

WHEREFORE, Defendants pray for judgment as follows:

On all Causes of Action for an award of damages sufficient to compensate them for the losses caused by the acts of Plaintiffs;

On their Fourth Cause of Action, treble damages, injunctive relief, and an award of attorneys fees as specifically provided in said statutes; On all Causes of Action, an award of exemplary damages, attorney's fees, costs, and other sanctions as are appropriate under Rule 11 of the Federal Rules of Civil Procedure, and such other relief as may be just.

Dated: May 21, 2003

DEMETRA LEWIS, ESQ. (#156868)
P.O. BOX 434
SAN CLEMENTE, CA 92674 (949) 661-1971

KARL E. MAY, ESQ. (#0033294)
PRO HAC VICE
BP TOWER, SUITE 2500
200 PUBLIC SQUARE
CLEVELAND, OH 44114
(216) 830-1111
(216) 830-1120 FAX

ATTORNEYS FOR DEFENDANTS
PRIM CAPITAL CORPORATION, INC.,
PRIM ADVISORS, INC.

## CERTIFICATE OF SERVICE

The undersigned attorney for Defendants certifies that a true copy of the foregoing

ANSWER AND COUNTERCLAIM OF DEFENDANTS was sent by United States mail to

Edward Vincent King, Jr., Esq., King & Kelleher, LLP, 20 California Street, 7" Floor, San

Francisco, CA 94111 and Philip Scott Ryan, Esq., 944 Union Street, San Francisco, CA 94133

this 21st day of May, 2003.

Karl E. May

## Investment Portfolio Analysis Program

$P$rim Advisors, Inc. ("Prim") and its engagement team appreciate this opportunity to assist ("Client") in a review of the performance, reporting, and fees of Client's money managers. We recognize that Client reviews the performance of its money managers, and is aware of the managers' fee structure. However, we believe that Client will benefit from Prim's comprehensive Investment Portfolio Analysis Program. The money management business is highly competitive, and fees and services have become increasingly negotiable as managers increase their own efficiencies to strive to retain clients. The Program is a process which reviews your investment objectives and asset allocation with respect to funds which you have under discretionary management, reviews the performance, reporting, and fees of your existing manager or managers, compares the performance and fees with those of other quality managers with similar approaches, and identifies opportunities for reducing management fees either by changing managers if necessary, or renegotiating management fees with existing managers based on the comparative information Prim compiles.

### Scope of Services

Specifically, Prim, as an independent contractor, will

• Review your needs and objectives and asset allocation;

• Review the fee structure, performance and contracts of all existing money managers;

• Review the fees and performance of comparable managers;

• Prepare a management letter on identified cost reduction opportunities, which may include assessments of and offers to provide services in the following areas:

  ❖ Recommend of one or more new managers and negotiate fees with them.

  ❖ Renegotiate of fees with existing managers and recommend targets for fee reductions and cost savings.

  ❖ Recommend, where appropriate, revisions in Client's advisory agreements to improve or simplify reporting (but not in any manner should this be interpreted as providing legal advice).

## Professional Fees

Prim's fees will be based solely upon any savings in management fees or costs, which you actually realize as a result of following any of Prim's recommendations. Specifically Prim's fee is a percentage of savings, and is an amount equal to 50% of moneys saved, calculated for a period of 1 year(s) from the date of implementation of Prim's recommendation(s) or until any new money manager relationships or changes in existing relationships end, whichever is earlier.

Prim's fee is the same, whether we negotiate for you, or you manage this process by yourself, although if you do this yourself you must keep Prim informed and let Prim know when and if you have achieved savings as a result of Prim's recommendations, and give Prim reasonable access to documentation so Prim can calculate and verify its fees. Prim's fees will be payable quarterly, at such time as Client's managers' fees are paid, and Client agrees to authorize and direct all managers with whom a new relationship with Client was established as a result of Prim's services under this agreement, or who have reduced their fees as a result of Prim's services under this agreement, to pay Prim its fees hereunder directly. In that regard, Client will cooperate with Prim to execute the necessary instructions or powers of attorney as the managers may require authorizing and facilitating these direct payments.

## Expenses

All out-of-pocket expenses will be absorbed by Prim.

## Confidential Information

Prim will preserve as confidential all information pertaining to Client's accounts, and shall only disclose such information to prospective money managers after identifying said managers to Client, and receiving Client's written permission to disclose. Prim will not use Client's account information for any purposes other than rendering its services under this agreement.

## Execution

If the terms of this engagement letter are acceptable to you, and the above services are in accordance with your understanding, please sign the enclosed copy of this letter in the space provided and return it in the enclosed pre-addressed envelope. Prim will send you a fully executed copy promptly. For your convenience, enclosed is an extra copy for your files.

Prim appreciates this opportunity to serve you under its Investment Portfolio Analysis Program pursuant to this agreement, and will strive to provide you quality service. If you have any questions regarding the proposed services, do not hesitate to contact us.

Sincerely,

PRIM ADVISORS, INC.

By:_____

      Anthony D. Delfre

ACCEPTED AND AGREED

By:_____

DATE:_____

# EXHIBIT B

## PORTFOLIO MONITORING AGREEMENT

This agreement is entered into between Prim Advisors, Inc. ("Prim") and _____("Client") this _____ day of _____, 2003. In consideration of the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the sufficiency and receipt of which is hereby mutually acknowledged, the partied agree as follows:

**Services**

1.  Prim, through its agent or agents as it shall designate, shall provide to Client the services indicated below:

> Analyze the performance of Client's investment portfolio identified on Exhibit A hereto (the "Portfolio"), taking into account Client's needs and objectives as communicated to Prim by Client initially, or as supplemented by Client, as the case may be. In connection therewith, Prim shall compare the performance of the Portfolio with such indexes and money managers as Prim shall deem appropriately based on Client's needs and objectives, and shall review such matters as asset allocation and diversification. Prim shall provide Client with a quarterly analysis of the Portfolio. Prim, however, does not undertake to monitor specific investment in the Portfolio, nor to give continuous advice regarding the purchase, sale, or holding, of specific securities or other investments, and is not obligated to keep Client informed of developments in the markets in general or with respect to specific companies whose securities are part of Client's Portfolio.

> If requested by Client, Prim will make recommendations regarding the selection of or replacement of one or more portfolio managers for the Portfolio, the purchase or sale of securities or other investments for Client, and upon instructions of Client, on a non discretionary basis, place orders for the purchase or sale of securities or other investments through such brokers, mutual funds, or agencies, as Client shall select or direct.

**Client's Responsibilities**

2.  Client recognizes that the value and usefulness of the monitoring services of Prim depend upon information that Client provides, and upon Client's active participation in the formulation of Client's objectives. Client will provide information requested by Prim, and also provide such other documents as Prim may reasonably request in order to permit complete evaluation and monitoring of the Portfolio. Unless Client updates any such information, and specifically informs Prim of any changes in any of the foregoing, Prim shall be entitled to rely on such information in connection with carrying out Prim's duties under this agreement.

**Compensation**

3.    Client agrees to pay Prim an annual fee for Prim's services calculated in accordance with Exhibit B hereto.

The fee shall be recalculated at the end of each calendar year, taking into account current market value adjustments. If this Agreement is terminated for any reason, Prim shall promptly refund the prorated portion of any pre-paid fees.

**Assignment and Termination**

4.    This Agreement shall not be assigned by Prim without the written consent of the client. It may be terminated by either party upon five days written notice.

**Governing Law**

5.    Investment adviser services performed by Prim Advisors, Inc. shall be in compliance with the Investment Advisers Act of 1940, rules and regulations thereunder, and applicable Ohio State Laws regulating the services provided by the Agreement.

**Acknowledgement**

6.    The Client acknowledges receipt from Prim of Part II of its ADV registration form under the Investment Advisers Act of 1940.

Client          _____

Address

Prim Advisors, Inc.

By:_____

**EXHIBIT A**

## EXHIBIT B

### Institutional Fee Schedule

| | |
|---|---|
| First $1 million | .30% per annum |
| Next $4 million | .20% per annum |
| Next $5 million | .15% per annum |
| Next $10 million | .10% per annum |
| Above $20 million | negotiable |

**EXHIBIT C**

<u>CONSULTING AGREEMENT</u>

## I.    <u>Investment Portfolio Analysis Program</u>

The National Basketball Players Association ("NBPA") agrees to allow Prim Advisors, Inc. ("Prim") and its engagement team the opportunity to assist members of the NBPA in a review of their financial investments, including the performance, reporting, and fees of individuals and entities that invest and manage money on their behalf. The NBPA believes that its members will benefit if they have an opportunity to engage an objective company like Prim, which has significant expertise in the area of financial investments, to perform its comprehensive Investment Portfolio Analysis Program ("Program"). Prim and the NBPA recognize that the money management business is highly competitive, and fees and services have become increasingly negotiable as managers increase their own efficiencies to strive to retain clients. The Program is a process which reviews a player's investment objectives and asset allocation with respect to funds the player has under discretionary management, reviews the performance, reporting, and fees of the existing manager or managers, compares the performance and fees with those of other quality managers with similar approaches, and identifies opportunities for reducing management fees, primarily by renegotiating management fees with existing managers based on the comparative information Prim compiles.

## II.    <u>Scope of Service</u>

Prim will serve as an independent contractor. In the event a player expressly requests that Prim perform the Program, Prim will:

- Review the player's needs, objectives and asset allocation;

- Review the fee structure, performance and contracts of all the player's existing money managers and perform appropriate comparisons and analyses;

- Review the player's financial and tax professional needs and objectives;

- Review the fee structure, performance and contracts of all the player's financial and tax professionals;

- Prepare a management letter on identified cost reduction opportunities. As part of those opportunities, Prim may offer to renegotiate fees with existing managers and recommend targets for fee reductions and cost savings. Prim may also, where appropriate, propose revisions in the player's advisory agreements to improve or simplify reporting (but not in any manner should this be interpreted as providing legal advice). Prim may also recommend, where appropriate, revisions in financial and tax professionals' fee structure and ongoing contracts.

## III.    Term

It is contemplated that this consulting agreement will include the 2002-03 NBA season, and run through the 2003-04 NBA season. Either party may terminate this agreement at anytime without cause.

## IV.    Professional Fees

For each player that requests the Program, should Prim materially perform the services contemplated under the Program as defined in Part II above of this Agreement, the NBPA will pay Prim a fee of $1,200 per player. Regardless of how many players use the Program, in no event will the NBPA pay Prim a total of more than $10,000 each season for Prim's services with regard to all players in the aggregate who use the Program. Notwithstanding the above, Prim may enter into an individual compensation arrangement with a player pursuant to which the player will compensate Prim on a level commensurate with the economic results the player achieves at the conclusion of the Program. Prim agrees to notify the NBPA of any such arrangement with any player, and agrees to waive the fee it charges to the NBPA with respect to any such player.

Under no circumstances will Prim solicit and/or accept as a client any player to whom Prim provides services under this Agreement.

## V.    Expenses

All out-of-pocket expenses will be absorbed by Prim.

## VI.    Confidential Information

Prim will preserve as confidential all information pertaining to the players' accounts. Prim will not use the player's account information for any purposes other than rendering its service under this Agreement.

## VII.   Entire Agreement; Arbitration

This agreement constitutes the entire agreement between the parties and shall not be superseded by any verbal statements or agreements. In the event a dispute arises between Prim and the NBPA regarding services provided for in this Agreement, the parties agree to submit to binding arbitration.

PRIM ADVISORS, INC.

By: _____

Title: _____Principal_____

Date: _____4-23-03_____

**ACCEPTED AND AGREED**

NATIONAL BASKETBALL PLAYERS ASSOCIATION

By: _____

Title: _____Exec. Director_____

Date: _____4-23-03_____

dn/spl/misc/NBPA-Prim

# EXHIBIT D



# NATIONAL BASKETBALL PLAYERS ASSOCIATION

August 23, 2002

G. William Hunter
Executive Director

VIA FAX

Mr. Steven Kravitz
General Counsel
CSI Capital
445 Bush Street/ 5th Floor
San Francisco, California 94108-3707

### Re:Bryant Stith

Dear Mr. Kravitz:

I am writing on behalf of Bryant Stith, who has approached our office and expressed some concerns about various aspects of his relationship with CSI Capital ("CSI"). It is our understanding that Bryant recently forwarded some basic requests for information to CSI regarding the services that the firm has provided to him. I am informed that CSI has been less than forthcoming in honoring these document requests.

Quite frankly, I am simply at a loss to understand how a reputable financial management firm can possibly refuse or fail to provide this type of information to its' own clients. There have been numerous stories and incidents over the past several years regarding the mismanagement of athletes' finances. I have also heard increasing concern from many of our union members about the lack of regulation and accountability of money mangers with whom they have dealt.

Therefore, it is of utmost concern to me when I hear that one of our players is not receiving answers to very basic questions and requests for information. I can assure you that we will take whatever action is necessary to insure that our players have a comfort level in understanding the types of services that your firm is providing and an understanding of the fees and charges that they are paying.

It is my suggestion that, at a minimum, Bryant very promptly receive adequate explanations from CSI regarding the work CSI has undertaken on his behalf with all the accompanying relevant documentation. It is his right and his prerogative

to evaluate, to the fullest extent possible, the professional services being performed for him.

On behalf of the Players Association, we will continue to suggest to all of our players that they take a more proactive role in addressing and understanding financial issues that affect them. By drawing out this process to the point where it has come to my attention, you have only strengthened my resolve in this regard.

I would appreciate a prompt response from you regarding your intent with respect to satisfying Bryant's concerns and providing the requested documentation.

Sincerely yours,

G. William Hunter

cc:    Bryant Stith

# PRIM CAPITAL
CORPORATION

KARL E. MAY
SENIOR VICE PRESIDENT
AND GENERAL COUNSEL

BP TOWER, SUITE 2500
200 PUBLIC SQUARE
CLEVELAND, OHIO 44114
216/830-1111 EXT. 2221  FAX 216/830-1120
E-MAIL kmay@primcapital.com
www.primcapital.com

26 August, 2002

Mr. Steven Kravitz, General Counsel
CSI Capital Management Inc.
445 Bush Street 5th Floor
San Francisco CA 94108
VIA FAX 415 956 3231

Dear Mr. Kravitz:

I am general counsel for Prim Capital Corporation and its affiliates. Prim Capital, as you know, has an understanding with the National Basketball Players Association pursuant to which it puts on seminars for players. Prim then provides financial services and financial services audits to players who so request it.

In that connection, Prim has contracts with two players, Elton Brand and Bryant Stith to perform an analysis of the performance and fees of current managers. Prim also has a portfolio monitoring agreement with Mr. Stith. Copies of these contracts are enclosed. Both have requested that your company provide information to Prim relating to your management of their assets so that Prim can perform its contractual duties. Your company, however, has refused to provide the requested information despite these requests, in violation of your fiduciary duty to your clients, as well as in violation of investment advisor regulations relating to duties owed to clients and the following of their instructions.

In addition, you personally left a voice mail message with Anthony Delfre, a Prim principal and representative, in which you stated:

> Anthony, Stever Kravitz, General Counsel for CSI Capital. Discussed your situation with Elton Brand and Brain Stith. They both were misinformed by you as to the nature of your relationship with the NBPA. Therefore they told us to

disregard any further inquiries from you. That's pretty much what I expected. Good luck to you.

We have played this message in its entirety for Mr. Stith, who adamantly denies having withdrawn his request, contrary to the assertions in your message. However, while he has confirmed that you told him that Prim has misrepresented its relationship with the Player's Association, he has assured us that he does not believe this to be true. Nor have we received any communication from Mr. Brand indicating that Prim should not proceed under its contract, and in fact he has confirmed by email that he desires Prim to proceed.

Your false statements to Messrs. Brand and Stith concerning Prim and its relationship with the Players' Association constitute a violation of the Ohio Deceptive Trade Practices Statute, Chapter 4165 of the Ohio Revised Code, and specifically Section 4165.02(9) thereof, which declares it to be a deceptive trade practice if a person "Disparages the goods, services or business of another by false representation of fact." Violation of this statute can result in an award of treble damages and attorneys fees as well as the entering of an injunction. Your actions also constitute the tortuous interference with Prim's contracts with these two players. I am enclosing a copy of the salient portion of this statute.

We can only assume that your refusal to follow your clients' demand to provide Prim with information, coupled with your false and disparaging statements about Prim, reflects a fear that Prim's evaluation of your fees and services pursuant to our contacts with the players reflects a fear on your part that the players will become aware of the fees and services you provide in comparison with those available from other vendors, and that upon learning this the comparison will be unfavorable to you . It would appear that you have made false statements about Prim to discourage the two players from having Prim exam the fees and services you have been providing.

You may be under a misapprehension that Prim is engaged in efforts to cause clients to terminate their relationship with existing advisors such as yourself. As you can see from the enclosed contracts, this is not the case. Prim's role it to review such items as performance and fees, compare them with others, and provide this information to the players so that they can determine whether they wish to continue a relationship, renegotiate fees, or bring in a new vendor, where appropriate. Prim frequently works with existing managers where fees and performance are competitive and does not necessarily recommend a change of the provider as a result of its audits.

We have advised the Association of your failure to follow your client's instructions as well as your interference with our contracts with Messrs. Brand and Stith. I understand that they have sent, or will send, a letter demanding that you honor their requests to provide information to Prim, in connection with their efforts to equip their members with more information about their financial affairs and to assist them in being more pro-active with respect to their investments.

Prim will not tolerate and further delays, interference with its contacts, and false and disparaging statements concerning its business, and will not hesitate to bring an action under the aforesaid statute if your company does not cease such conduct immediately. Please advise me of your intentions upon receipt of this letter.

Very truly yours,

Karl E. May

cc. Elton Brand ✓
    Bryant Stith ✓
    Purvis Short NBPA ✓
    G. William Hunter NBPA ✓

# Blitman&King LLP

Bernard T. King
Charles E. Blitman\*
Jules L. Smith
James R. LaVaute
Donald D. Oliver
Jennifer A. Clark
Melvin H. Pizer†
Monica R. Heath
Kenneth L. Wagner
Gary A. Hall\*\*
Timothy R. Bauman

Stephanie A. Miner
Michael S. Travinski
Nathaniel G. Lambright
Kara A. Hiller
Seamus P. Lyman\*
George H. Sellaway††

\* Also Admitted in MA
† Also Admitted in FL
\*\* Also admitted in Ct, VA and DC
\* Admitted in FL
†† Also Admitted in CA

Attorneys and Counselors at Law

Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204-1415

(315) 422-7111
FAX (315) 471-2623
postmaster@hklawyers.com

**GARY A. HALL**
gahall@hklawyers.com

March 26, 2003

The Powers Building, Suite 207
16 West Main Street
Rochester, New York 14614
(585) 232-5600
FAX (585) 232-7738

Kelly L. Cook, CRBS

Nathan H. Blitman
(1908 - 1990)

**VIA UPS OVERNIGHT**
Mr. Anthony Delfre
Prim Capital
200 Public Square
BP Tower, Suite 2500
Cleveland, Ohio 44114

Re:     Letter from Philip Scott Ryan dated March 21, 2003

Dear Mr. Delfre:

I am enclosing a letter dated March 21, 2003 from Attorney Philip Scott Ryan addressed to G. William Hunter, Executive Director of the National Basketball Players Association, for your consideration. Mr. Hunter had instructed me to respond to Mr. Ryan's letter. After some deliberation, I think it appropriate if you, or someone from your office, respond to Mr. Ryan's letter inasmuch as I have no knowledge concerning Mr. Ryan's allegations and/or contentions.

I am enclosing a copy of Mr. Ryan's letter for your review and analysis. If you have any questions, please do not hesitate to call.

Very truly yours,

BLITMAN & KING LLP

Gary A. Hall

GAH/cwf
Enclosure
(cwf:NBPA\Delfre-ltr)

### PHILIP SCOTT RYAN
ATTORNEY AT LAW
944 UNION STREET
SAN FRANCISCO, CA 94133

TELEPHONE 415.611.0450
FACSIMILE 415.611.0455
EMAIL POPBUJHILU@AOL.COM

March 21, 2003

G. William Hunter
National Basketball Players' Association
2 Penn Plaza
New York, NY 10121

Dear Billy:

Please be advised that we have been formally retained by Leland Faust as legal counsel to CSI Capital Management, Inc. ("CSI") in connection with a systematic campaign by Prim Capital Corporation ("Prim") to disparage and defame CSI and tortuously interfere with its contractual and business relationships with its clients. The clients involved are union members of the National Basketball Players Association ("NBPA"). It appears the union's good name is being affected by Prim's misrepresentations that they are the "authorized auditors" for NBPA.

As you will recall, we talked briefly and superficially on March 10, 2003, prior to your March 11, 2003 meeting with Leland Faust in your New York office. At the time of our telephone conversation, I had not been thoroughly briefed by Leland on his and CSI's problems with Prim. Nor could I attend the meeting since I was then defending San Francisco Police Chief Earl Sanders who had been indicted on February 28, 2003. As an aside, you will be pleased to learn that all charges against Earl were dismissed on March 11, 2003. Leland had asked me to call you to vouch for his integrity and competence. Because I have known you since our law school days at Howard University School of Law and I have known and worked professionally with Leland representing NBA players, Major League baseball players, NFL players, recording artists, motion picture actors and African American record company executives for more than a quarter of a century, it seemed a modest request.

Following your meeting with Leland and Anthony Delfre of Prim, CSI formally retained us. Our investigation into this matter compels this letter to address misrepresentations that have been and are being made to your union members by Prim. It is important to understand that this letter is not intended to exhaust the subject and is limited to questioning what appears to be appears to be Prim's "pimping" NBPA. The legal conflict between CSI and Prim, one of CSI's financial planning and investment counseling competitors, is a matter for jurisdictions other than your union.

Perhaps my personal knowledge of Leland's and your integrity and abiding commitments to the professional athletes you both serve compels candor. It is also true that both you and Leland support the idea of independent auditors assisting union members in monitoring their financial matters. I bring this matter to your attention because Prim's misconduct as an "auditor" for personal gain reflects adversely on Leland professionally and on your union leadership. It is my hope that my suggestions for addressing this unfortunate situation will be accepted by you as a sincere effort to assist two old friends with high ethical values.

Our investigation reveals the following:

I understand that last summer the NBPA commenced a program to perform so-called "audits" for its members of their financial affairs. It appears that you invited representatives of Prim to attend a meeting of the players in the summer. Apparently, at that meeting it was suggested to the players that they retain Prim to undertake "audits" of their financial affairs. Such audits would include reviewing investments, fees paid and anything related to it. Apparently, some of the players signed up at that time. When the NBA season began last November, the process continued, but on a more intense level. I believe that you had mandatory union meetings with each of the 29 teams, separately. At the meetings, a representative of Prim (usually Anthony Delfre) made Prim's pitch. He suggested that players should have their affairs audited by Prim. The issues I request the NBPA to address at this time are: (1) the inappropriateness of Prim misusing your good offices, (2) Prim's phony "audit proposals" to steal clients for its competitive securities business, (3) the inherent conflict of interest that infects Prim's participation in your well-intended audit process, and (4) Prim's failure to disclose the true nature of their services and background to your members.

Billy, I see this as a two-pronged problem. For CSI it is about Prim's stealing clients by misrepresenting union blessing and misrepresenting CSI's position. For the NBPA, it's about stealing a good union's name.

## 1.   To audit or not to audit.

First, let us be very clear. CSI strongly supports your view that financial advisors and financial managers of professional athletes should willingly submit to independent, competent and honest audits.[1] Indeed, Leland has suggested to you that independent outside auditing firms be employed and that the model of the Major League Baseball Players' Association be adopted. The baseball players union invites financial people to address its members, provided they agree in writing that they will never represent the players to whom they make presentations. The obvious and sound purpose for this rule is to give players independent advice as opposed to an opportunity for marketing pitches.

Prim's so-called "audits" are not independent audits in any sense. They are thinly disguised marketing events for Prim and a crude vehicle for stealing its competitors'

---

[1] For your information, outside certified public accounts annually audit all of your members' securities accounts with CSI and report to the Securities and Exchange Commission.

clients. Prim is not an auditing firm, they are investment advisors. Its own website states that Prim provides "financial planning and investment counsel and individualized, long term financial planning and investment strategies." (Exhibit A.) As stated on its website: "Prim Advisors, Incorporated, an SEC registered investment advisor, is our cash fee for service based investment consulting business."

At your March 11, 2003 meeting with Leland Faust, Chairman and Founder of CSI, and Anthony Delfre, Vice-president of Prim Advisors, Inc., I understand you directly asked Mr. Delfre whether Prim was an investment advisor or money manager. He told you that Prim was neither. To put it bluntly, Mr. Delfre lied to you. The following establishes Mr. Delfre's deceit of you as leader of the players' union.

In addition to its marketing materials, its own contracts with NBA players show that they are investment advisors. (See Exhibit B, a copy of one of the contracts Prim signed with one of CSI's clients.) As you will see on the highlighted areas on page 1, they indicate that they will make recommendations regarding the "purchase or sale of securities or other investments". This is obviously investment advice. Any doubt that Prim is an investment advisor and not an independent auditor and that Mr. Delfre lied to your face is erased in their form ADV filed with the Securities and Exchange Commission. (Exhibit C) Form ADV is filed by investment advisors.) In Exhibit C, Prim states that they manage $852 million on a discretionary basis. They have also checked the box indicating that they provide advisory portfolio management for individuals. A few interesting points are highlighted in yellow. They are clearly an investment counseling firm, and any denial of that fact is a lie.

If required SEC filings are not enough, Prim's public relations documents state: "Prim Capital Corporation was founded to provide objective financial planning and investment counsel and individualized, long-term financial planning and investment strategies for individuals, trusts and institutions." (Exhibit D. Emphasis added.)

In short, allowing Prim to do audits for your union members is equivalent to having an agent auditing other agent's work. The absence of objectivity and the pressure of unending conflicts of interest are obvious.

Take a close look at Prim's contract with your union members. (Exhibit B.) Their phony audit is free! The only way Prim can get paid for their "audit" is if the player hires them for investment and financial management services! Succinctly stated, there are only two ways for this "auditor" to profit: (1) Your union members fire CSI and hire Prim! (2) Or the union member pays Prim a fee by reducing CSI's fees![2]  Therefore, Prim's financial incentive can never be neutral regarding CSI's fees. Such an ethical notion renders Arthur Anderson's auditing and consulting functions for Enron a modest conflict of interest in comparison. From a player's perspective, it is made to appear that NBPA is offering free auditing services through Prim.

## 2.    Anthony Delfre's dubious ethical history.

---

[2] Whether or not adding Prim's fees to CSI's fees save the client anything is uncertain.

It appears from our investigation that the principal Prim employee and "auditor" in this scam is Anthony Delfre. You and the NBPA should be aware of his checkered past. Delfre worked for Merrill Lynch as a broker. He was employed for about a year and then left. Merrill Lynch immediately sued him for injunctive relief. A copy of the complaint is attached as **Exhibit E**. The case was ultimately settled. However, it is interesting to note, that the case included allegations that Delfre had used Merrill Lynch's intellectual property to help him at his new business with Prudential. As shown on page 7 of the complaint, Merrill Lynch claimed that he was soliciting Merrill Lynch's clients to terminate their relationship with Merrill Lynch and transfer their accounts to Prudential. Stealing clients appears to be one of Mr. Delfre' patterns and apparently was so egregious that Merrill Lynch took the rare step to file a lawsuit to protect its clients from their former employee.

In January 1998, Delfre was still at Prudential Securities when he was "permitted to resign". (**Exhibit F**, NASD record.) In Mr. Delfre's case, Prudential alleged that he had made an "unauthorized payment to a non-employee." I am certain you will agree that someone with a record of lawsuits for stealing his employers' clients and rule violations of fiduciary duties should not be representing that he is the auditor for the NBPA.

More importantly, does not the NBPA have fiduciary obligations to its members to disclose Mr. Delfre's shady history before he induces them to enter into phony *free* audits that profit his investment company?

While there are other issues of controversy between Prim and CSI that may be beyond the purview of your office and may have to be resolved in court, immediate remedial action by the NBPA is necessary to protect your union members from Prim's orchestrated campaign of misrepresentations. I appreciate that Prim is not employed by nor an agent of the union. What is equally clear is that they are claiming the *imprimatur* of NBPA in their solicitations of player contracts, and most of the players believe that they represent the union. It seems to me that the union's fiduciary duties require immediate disclosure to your members of the true facts about Prim. In addition, your union leadership should not allow the NBPA's good name to be harmed by such blatant deceit by Mr. Delfre to the players and to you.

I am not suggesting that you should be the judge and jury in the dispute between CSI and Prim. Indeed the ultimate purpose of this letter is to assure that NBPA is not drawn into this controversy at all. We do have a proposal that will preserve your sound idea of audits of financial advisors and extricate your union from the conflicting interests I have described above. I suggest you inform your membership of the following:

1. The NBPA believes its suggestion to members of financial audits of their financial advisors was and is sound and prudent advice.

2. The NBPA has learned much from the program of audits proposed last summer. As a result of reviewing the "program," the NBPA recommends to the membership the following:

a. The NBPA does not endorse, authorize or recommend any individual or group as auditors for its members. Members should understand that NBPA will and should not endorse any auditor.

b. The NBPA affirmatively recommends to its members that auditors be truly independent and have no interest, financial or otherwise, in the outcome of the audit. [3] In this regard, any financial professionals invited to meet your members by NBPA must agree in writing that they will not represent any players who they meet through your good offices, similar to the Major League Baseball Players' Association.

Having known you and Leland for three decades, I am confident that we all know a scam when we see one. I am equally confident that a sound audit program for your members can be quickly achieved through your good offices and with the full cooperation of responsible and honest financial advisors.

Best personal regards,

PHILIP SCOTT RYAN
Attorney for CSI Capital Management.

---

[3] It may be appropriate to compile a list for your membership of nationally recognized audit firms to fulfill the promise of your audit program. It should be made clear that the auditors are not endorsed or blessed by NBPA and that they shall not take on members as investment advisors or financial managers nor recommend others as investment advisors or financial managers.



# PRIM CAPITAL

CORPORATION

KARL E. MAY
SENIOR VICE PRESIDENT
AND GENERAL COUNSEL

BP TOWER, SUITE 2500
200 PUBLIC SQUARE
CLEVELAND, OHIO 44114
216/830-1111 EXT. 2221 FAX 216/830-1120
E-MAIL kmay@primcapital.com
www.primcapital.com

31 March 2003

Philip Scott Ryan, Esq.
944 Union Street
San Francisco CA 94133

Re: Your letter to G. William Hunter of 21 March 2003

Dear Mr. Ryan:

Gary Hall, counsel for the National Basketball Players Association, has forwarded to Prim Capital Corporation your letter to G. William Hunter of 21 March 2003. I am counsel for Prim and its subsidiaries, as well as Anthony Delfre.

It appears that your claimed relationship with Mr. Hunter erroneously caused you to believe that this immunized you and your client from laws relating to libel, deceptive trade practices, tortuous interference with contracts, and business defamation, and relieved you from the obligation to verify facts before engaging in a deliberate effort to injure the business and reputation of another. Indeed, your purported "investigation" is nothing more than a self-serving, deliberate distortion of uncontestable facts, "spun" to create negative inferences. Thus, not only is your letter full of specious assertions, falsehoods, egregious mischaracterizations, question-begging conclusions, and unfounded and unprovable charges, but it is also manifest, in part through your use of such *per se* defamatory terms as "pimping," "scam," "phony," "stealing," and "blatant deceit" that you did so willfully, deliberately, and with the unequivocal and very specific intent to cause actual injury to both Prim and Anthony Delfre while seeking to advance the interests of your client.

Some of your most egregious and *prima facie* defamatory statements, and our response to each, are as follows:

1. Prim is making misrepresentations to union members.

Prim presented to NBPA and its members written materials detailing exactly the nature of Prim's business, the services it provides, and what the nature of Prim's relationship with any player who chose any of Prim's services would be. The presentation was approved by the NBPA Director of Player Programs. Moreover, Prim Advisors is an SEC registered investment advisor who is subject to regular examinations by the SEC. Your letter in addition to its other spurious charges, in effect falsely accuses Prim Advisors of violation of the Investment Advisers Act of 1940. In fact, it is your client, CSI, and now you who is making misrepresentations. Attached is my letter to CSI's counsel articulating some of the issues CSI has created. It is patently clear that CSI, and now you, are attacking Prim in an attempt to discredit Prim because Prim has discovered facts that CSI is engaged in unethical and potentially illegal practices vis a vis members of the NBPA.

2. Prim is "pimping" NBPA.

Anthony Delfre has six years of experience servicing a relationship with NBPA, while under the guidance of Joseph Lombardo, Prim's chairman and president. Before forming Prim, Mr. Lombardo headed the Sports and Entertainment division of Merrill Lynch for a number of years (as well as serving as executive vice president for a brief period at Prudential Securities), and this relationship with Mr. Hunter was maintained at all three firms. Mr. Hunter is very familiar with Prim, Mr. Lombardo, Mr. Delfre and the services Prim is now offering, and in fact, neither you nor CSI know what information Prim provided to the NBPA in connection with the NBPA's decision to allow Prim to offer its services to its members. For you to suggest, without having any factual basis to do so, that Prim has somehow managed to mislead Mr. Hunter into allowing Prim to offer its services to members of the NBPA is a stunning insult to Mr. Hunter as well as defamatory to Prim and Mr. Delfre.

3. Prim is engaging in misconduct as an "auditor" and using "phony contracts" that reflect adversely on Mr. Hunter's union leadership.

Your use of the word "audit" and obfuscation of that term by introducing the concept of audits of financial statements, as well as your letter, manifests an attempt to distort the service that Prim provides to players. Prim enters into an "Investment Portfolio Analysis Agreement" or a "Financial Services Analysis Agreement." Both agreements fully and fairly state the scope and nature of the services, and these are explained to players by use of accurate written materials in addition to the contracts themselves. Professionals affiliated with Prim who perform these services hold a number of licenses and designations, including

2

registered investment advisory representatives, Certified Public Accountants, MBAs, Certified Financial Planners, Certified Financial Analyst, Certified Investment Manager Analyst and a Masters Degree in Taxation. Prim's analyses review fees and services that players receive from organizations such as CSI and provide comparisons. No reputable advisor or investment professional should fear any such analysis, and in fact should welcome it because it might assist the professional in meeting the client's needs and identify savings for the client. Prim does exactly what it says it will do.

As to your assertion that Prim's contracts are "phony," be advised that these agreements were drafted by an experienced securities lawyer, modeled after contracts used by others in the same business, and further reviewed by a highly reputable Washington D. C. law firm. Mr. Hunter is aware of this, which completely negates your inference that he and NBPA have not adequately investigated Prim's services.

It would seem that CSI is concerned because it has not faired well in the comparison process, and, not surprisingly, members who are clients of CSI are the ones most frequently requesting Prim's services.

4. Anthony Delfre lied to and engaged in "deceit" with Mr. Hunter regarding Prim's status as an investment advisor.

It is Mr. Faust who made false statements to Mr. Hunter during a meeting at the NBPA with himself, Mr. Hunter, Mr. Delfre, and Theresa Messer. Mr. Faust, according you your letter, claims that Mr. Hunter asked Mr. Delfre if Prim was an investment advisor or a money manager. Mr. Hunter, who was already familiar with Prim's business, did not ask that question. Mr. Delfre was asked to address the issue by Ms. Messer, in response to an accusation by Mr. Faust that Prim was "stealing" CSI's clients. Mr. Hunter was not even present during this exchange. What Mr. Delfre stated was that Prim had provided financial services analyses to three of CSI's clients, and that one client had terminated his relationship with CSI based on the analysis, that this client had other advisors who he still employs but that their fees are now lower as a result of Prim's analysis. This same client has also hired Prim as a consultant/advisor to monitor his portfolio and work with his other relationships including measuring performance. Mr. Hunter, and the NBPA, are aware that these services are provided to players, and are also aware of the specific case referenced above. The other two players who contracted with Prim to perform an analysis (or "audit") remain clients of CSI, and in fact CSI, after first refusing to provide information to Prim that the client authorized to be provided, convinced that client not to proceed with the contracted-for Prim analysis. This issue was addressed directly with Mr. Faust at another meeting involving himself, Mr. Delfre, and Mr. Hunter.

Mr. Hunter is aware, and Prim discloses to the members, that if offers various services within the financial services industry. The services offered to the NBPA

3

and the members are advisory only, in that Prim does not directly manage assets and make portfolio decisions. This differs from the services offered by CSI, who advises AND manages assets directly, and who also puts its clients in mutual funds sponsored by CSI. This, of course, is a clear conflict of interest. The irony is that you, and Mr. Faust, have accused Prim of having such conflict of interest, when this is not the case, when in fact it is CSI and Mr. Faust who have the conflict. Indeed, CSI acknowledges the same by asking its clients to waive this conflict in language that is at best obscure, and it would not be apparent to the average person what conflict is actually being waived or the significance of the waiver. Moreover, Prim discovered, in the course of its review of CSI's Agreement-Financial Services, that CSI uses Mr. Faust's law firm to provide legal services, apparently on the member's behalf, as are needed in the performance by CSI of tax planning, tax compliance and financial advisory services, even while Mr. Faust is an owner of CSI, and that clients are charged widely disparate and very high fees for the same services. Such fees are based on one and one half percent of pre- tax income for the member rather than the actual time required for the service, and no separate bill for legal services is rendered. In addition, Prim discovered that neither Mr. Faust's law firm nor CSI maintain time records or other backup to validate or justify the fees being charged, a fact that Mr. Faust acknowledged in the meeting with Mr. Hunter, Mr. Delfre, and Ms. Messer after he asserted that this fee was negotiated with each member. To accuse Prim of acting upon a conflicted interest in pointing such things out is frivolous at best, and in reality is nothing more than the old trick of attacking the messenger when you don't like the message.

I further understand that Mr. Faust advised Mr. Hunter and Ms. Messer that CSI had discontinued the practice of charging fees for tax consulting based on a percentage of the client's pre tax income on its own volition, when in fact it did so after being confronted by a member with a complaint for excessive fees vis a vis other members. Even after CSI discontinued this practice, we understand that CSI did not maintain time records from which an outside auditor could verify the time spent and reasonableness of the fees charged, and that Mr. Faust has acknowledged that contemporaneous records were not maintained.

5. The services offered by Prim to players are impacted by purported conflicts of interest of which Mr. Hunter is unaware, and in particular that these services can never be objective

As noted above, Mr. Hunter is fully aware of the services Prim offers and full disclosure has been made to him and NBPA, as well as its members. Your presumption that he, and the NBPA would proceed without having engaged in the degree of due diligence appropriate under the circumstances is an insult to Mr. Hunter and NBPA.

4

6. Anthony Delfre's alleged "unethical" history.

You state that "it appears from our investigation that the principal Prim employee and 'auditor' in this scam is Anthony Delfre. You and the NBPA should be aware of his checkered past." You also ask Mr. Hunter to conclude from a litigation matter in which Mr. Delfre was involved that he has a "pattern" of "stealing clients" and opine that the action that Merrill Lynch brought was a "rare step" precipitated by what must have been "egregious" conduct by Mr. Delfre.

Your attempt to cause Mr. Hunter to draw adverse conclusions and to suggest deception concerning something that (a) is in fact disclosed in Prim Advisor's form ADV; and (b) of which you know nothing about, is further proof of your intent to cause harm to Prim and Mr. Delfre. If you knew anything about the securities industry, you would know that over the past few years, it was extremely common for all the major wire houses to seek an injunction against a departing broker and claim, based on agreements and/or legal principles that the customers belonged to the firm and not the broker. In fact, it became so common that it was an assumed fact that suit would be filed when a broker changed firms. Thus, not only was such litigation not "rare" but it was normal and part of most firms' strategy. As every practitioner in this arena knows, these cases were routinely settled by payment from the firm to the broker joined to the firm from which he departed. Further, as a lawyer, surely you know that a settlement is not an admission of wrongdoing, and absent an adjudication your attempts to construe allegations as tantamount to a legal finding is disingenuous at best. Given this context, this sort of litigation does not reflect adversely upon Mr. Delfre at all, especially absent an adjudication of wrongdoing. Your attempt to portray it as something extraordinary and inimical to Mr. Delfre's reputation, as noted above, manifests a specific intent to cause injury.

Similarly, you know nothing about the underlying facts concerning Mr. Delfre's resignation from Prudential Securities, nor the resolution of the issues reported as an allegation only. For you to attempt to cause Mr. Hunter to reach a negative conclusion from the public disclosure of this matter based on mere allegations without an adjudication is further proof of the malice that you and CSI bear towards Prim and Mr. Delfre.

After having repeatedly defamed Prim and Mr. Delfre, your letter then attempts to claim the moral high ground by suggesting that you are acting only for altruistic reasons, that your goal is merely to alert NBPA and Mr. Hunter so that they will not breach their "fiduciary duties" so that they can "extricate" themselves from "conflicting interest." You also assert that you do not wish them to be "judge and jury" in the dispute between CSI and Prim, and that rather than drawing them into a dispute between Prim and CSI your purpose is to assure that NBPA is *not* drawn into the controversy.

5

Your purported lofty sentiments are as laughable as they are transparent. Obviously, your letter asks the NBPA to agree with your conclusions, which you falsely present as facts to legitimize and leverage CSI's position with clients.

I would strongly suggest an immediate retraction as well as the distribution of this retraction to anyone to whom your letter has been disseminated.

Very truly yours,

Karl E. May

Cc: Gary Hall, Esq., G. William Hunter